**FALCON LAW FIRM, LLC**
BY: Todd M. Sailer, Esquire *Attorneys for Plaintiff*
Attorney I.D. #86013
122 E. Court Street Doylestown, PA 18901
Tel: 215-360-3880

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DIANNE COCHRAN** | : CIVIL ACTION |
| | : NO: 20-4997 |
| v. | |
| **ULTA BEAUTY INC., et al** | : |

### PLAINTIFF'S PRETRIAL MEMORANDUM

### FACTUAL BACKGROUND

Plaintiff, Dianne Cochran was injured in Defendants' premises on May 6, 2018 when she visited the store to replace nail polish on an endcap display as part of her employment duties. Ms. Cochran testified that the bottom of the endcap was resting on the floor and that when she pulled a nail polish from it, it toppled down on her causing her to fall to the floor. The endcap is designed to be attached to the shelving which is called a gondola by way of a plastic lip which angles downward at a 90 degree angle and attaches over a bar secured to the gondola. **(See photographs of endcap Exhibit 3) (Ulta Manager Harrell Deposition Testimony Exhibit 44 at 19-23)**

Defendant Ulta's Manager, Eric Harrell testified that Ulta was using a cardboard hairdryer box to place underneath the endcap apparently to help secure it. **(See photograph Exhibit 4) Harrell Dep Ex.44** Harrell testified that the endcap was always hung off the gondola and the bottom of the floor since she started at the store in 2016. **(Id. )**The photographs also show and Plaintiff's testimony establishes that the endcap at issue had been cracked. **(See photograph**

**Exhibit 5)** Harrell acknowledged that there was crack on the top of the endcap before the incident. **(Harrell Deposition Exhibit 44 at 25, 26)** Ms. Cochran stated that the endcap was able to twist and seemed unstable when she was trying to lift it off of her.

Defendant Ulta concedes that it was Ulta's responsibility to inspect the endcap for any safety issues and to maintain the endcap. **(See Harrell deposition Exhibit 44 at 12-15)** After Defendant was placed on notice of Plaintiff's claim and in fact after the lawsuit was filed and Defendant was served, the endcap at issue was removed from the store and destroyed and a new endcap was installed in July 2020. **(See Complaint time-stamped on 4/14/2020 and service email sent to defense counsel Exhibit 45) (Harrell testimony Exhibit 44 at 41-45)** Consequently, this is clear spoilation and there should be an adverse inference that the endcap at issue had a defect which rendered it unsafe for use and which caused the incident herein.

Ms. Cochran submitted a report to her employer describing in handwriting the incident which occurred. This report contains Ms. Harrell's signature. Ms. Harrell agreed at her deposition that the signature looks exactly like her signature but oddly attempted to deny that she signed the report. **(See Cochran report Exhibit 1)** She conceded that if there was anything inaccurate on the report she would not have signed it. **(See Harrell deposition Exhibit 44 at 54-58)** Additionally, Ms. Harrell completed an incident report, on the incident at 3:23 p.m. stating that Ms. Cochran was struck or injured by-falling or flying object-trunk-lower back area-specific injury-strain and in response to a question on the form "is this claim questionable?" she entered no. **(See Harrell incident report Exhibit 2)**

Instructions which Ms. Cochran had received from her employer show that this type of endcap is supposed to rest upon the floor while simultaneously secured on the gondola to secured it. **(See Instructions Exhibit 47** Ms. Cochran will testify that this is how the endcaps are supposed to be placed. **(See Cochran Affidavit Exhibit 11)** As Defendant noted in their brief which has a portion of Plaintiff's deposition transcript attached to it, Ms. Cochran arrived to the store about an hour to an hour and a half prior to the incident and was placing product on shelves in the vicinity of the endcap during this time. She will testify that she did not notice anyone moving or altering the endcap in any way. **(See Cochran Affidavit**

**Exhibit 11**) As Defendant also noted, Ms. Cochran testified that the bottom of the endcap was resting on the floor. She did not notice whether the top was secured prior to the incident. However, Defendants' manager Erica Harrell confirms that if the bottom of the endcap was resting on the floor the top would not have been secured. **(Harrell deposition Exhibit 44 at 45)** Pictures taken after the incident by Plaintiff's co-worker show the endcap was placed back on the top of the gondola with space underneath between the bottom of the endcap and the floor with the cardboard box underneath the endcap apparently used to attempt to secure it. **(See photographs of raised endcap Exhibit 4)**

Harrell stated that she passed by the endcap on the day of the incident before the incident. **(Harrell Exhibit 44 at 23)**

## **LIABILITY**

Engineer John Yannaccone reviewed this matter. He stated that the endcap has a similar proportion to a bookcase in that it is tall and narrow and that such objects have less inherent stability than shorter objects with wider bases and therefore more prone to tip over when not secured properly. Mr. Yannaccone stated that regardless of how the endcap display was positioned prior to the incident there is no scenario where the display should fall a person. He stated that given the design of the endcap, if the display is in good condition and properly installed, the tope of the endcap display will be engaged with the end of the gondola such that the endcap must be lifted up to separate it from the gondola. He found that if the endcap was not hanging on the gondola but rather sitting on the floor unattached to the gondola it would be a tall narrow based object that would be far less stable.

Mr. Yannaccone noted that Ms. Cochran testified that the endcap would twist when she tried to lift it off her after it fell and that there was a crack observed in the top of the endcap after the incident. He also noted a photograph taken after the incident where the endcap display is raised up from the bar of the gondola and that this endcap was not properly secured to the gondola as intended and that the addition of a box to aid in support of the endcap clearly shows that there was a problem that someone in the Ulta store tried to address by adding support to the endcap display. He further noted that since the endcap was disposed of by Ulta

there is no way to determine how or why the separation occurred if the endcap was attached to the gondola. Mr. Yannaccone found that if Ms. Harrell's testimony is accepted that the endcap display was in place on the end of the gondola there is no reason why it would separate from the gondola and fall towards Ms. Cochran as she removed a bottle of polish. He noted Ulta's interrogatory answers and Ms. Harrell's testimony that all Ulta employees are responsible for upkeep of the premises including the displays inside the store but that she could not state when the endcap was last inspected prior to the incident. He stated that the need to add a box to support the display should have been a clear indication the Essie endcap display was not sufficient enough to secure the unit to the gondola and indicated the need for repair or replacement. Mr. Yannccone stated that if the endcap was removed from the gondola was resting on the floor as testified by Ms. Cochran a new tip over hazard was created. He added that if it was determined that the endcap display was damaged to the point it could not safely remain supported by the gondola it should have been removed from the sales floor rather than converting it to a free standing display. **(See Yannaccone report Exhibit 31)**

## **DAMAGES/PERSONAL INJURIES**

After the incident, Ms. Cochran felt dizzy and nauseous and had neck and lower back pain. She went home and rested but the next day she was taken by her daughter to Grandview Hospital emergency room where she was complaining of neck, lower back and left shin pain. X-rays were taken which did not reveal fractures. She was given pain medication and discharged to home. **(See ER record Exhibit 13)**

The following day she was evaluated by Dr. Lindsay Pereira at Lehigh Valley Physicians Group Family Medicine for back pain. She reported burning and tingling in her back and shooting pain down into the buttocks and legs on the left side with numbness in her leg. She was prescribed Naproxen, Cyclobenzaprine and Lidocaine and referred to LVPG Concussion and Head Trauma.**(See Pereira note Exhibit 14)**

Ms. Cochran was seen back at St. Luke's University Health by Dr. Wei-Shen Lin on the same day for left knee pain from the incident. A left knee surgery

was recommended and she was still complaining of low back pain. **(See Dr. Wei-Shen Lin note 5/8/2018 Exhibit 16)**

Ms. Cochran began treatment with LVPG Concussion and Head Trauma program on May 18, 2018. She was having moderate intermittent daily headaches 2-3 times per day. She also stated that noise worsened her headache and that flashing lights caused headaches. She was also experiencing nausea. She was having balance problems and dizziness. She was having difficulty concentrating, thinking and remembering. She reported irritability and difficulty completing tasks on a computer. **(See concussion records Exhibit 15)**

From March 2018 to August 23, 2018 Ms. Cochran underwent physical therapy at Occupational Therapy at Lehigh Valley Hospital for post-concussion syndrome pain.

Ms. Cochran was treated by Dr. Robert Corba at OAA Orthopaedic Specialists on June 6, 2018 for low back pain and left leg pain. He recommended a lumbar epidural steroid injection at L3-4. This injection was performed on June 13, 2018. **(See OAA records Exhibit 18)**

She was seen by Dr. Thomas Haley at Performance Spine and Sports Physician on July 2, 2018 for her back and neck pain. She reported numbness and tingling in her left arm to her fingers and pain down her left leg occasionally reaching her toes. She was prescribed Valium and there was a consideration for left C2-C3, C3-C4 steroid injection. This injection was performed by Dr. Haley on July 13, 2018. **(See Performance Spine records 7/13/18 Exhibit 17)**

On July 19, 2018 Ms. Cochran reported to Dr. Corba that the lumbar injection helped at first but that her pain slowly returned and had increased. Dr. Corba thereafter performed facet injections at L4-L5 and L5-S1 on July 20, 2018. **(See Corba note 7/19/2018 Exhibit 18)**

Neurosurgeon Nirav K. Shah, M.D. evaluated Ms. Cochran on December 28, 2018. She was experiencing headaches 2-3 times per week associated with memory problems, nausea, fatigue, irritability and light sensitivity, radiating neck pain and low back pain radiating into the left leg.

Dr. Shah reviewed the MRI of the lumbar spine taken May 14, 2018 which he stated at the very least showed aggravation at L4 -L5 with a disc protrusion. He recommended an MRI of the cervical spine. (**See Shah note dated 12/28/18 Exhibit 21**)

Dr. Shah re-evaluated Ms. Cochran on March 22, 2019. He reviewed the cervical MRI which he stated showed significant neural compression at C4-C7 which correlated to her complaints. He stated the end point would be decompression and fusion of C4-C7 but her recommended a physical therapy program prior to surgery. (**See Dr. Shah note 3/22/19 Exhibit 21** )

Ms. Cochran participated in physical therapy at St. Luke's Bone and Joint for her neck and low back from May 3, 2019 through July 26, 2019.

Dr. Michael Fishman at Center for Interventional Pain and Spine performed left diagnostic medial branch blocks at L2, L3, L4 and L5 on May 31, 2019. (**See Fishman records 5/31/19  Exhibit 22**)After that, Ms. Cochran attempted massage therapy at Donna Larkin/Therapeutic Massage therapy from June 19, 2019 through December 9, 2019 for her neck and low back pain.

Dr. Fishman performed an epidural steroid injection at L4-L5 on June 28, 2019. He prescribed Percocet and recommended she continue a home exercise program and medical massage. Dr. Fishman referred her to a surgeon for a possible fusion of the cervical spine. (**See Fishman record  6/28/19 Exhibit 22**)

On July 8, 2019, Ms. Cochran reported to Dr. Melanie Hu at Center for Interventional Pain and Spine and advised that the lumbar epidural steroid injection had relieved the radiating pain into her legs. She was referred to Dr. Cope for surgery.

Dr. Shah re-evaluated Ms. Cochran on July 19, 2019 at that time she was complaining of severe neck pain with radiation and numbness down the right arm. She also had low back pain but the cervical symptoms were dominating at that time. He recommended that she undergo a C5-7 decompression and fusion. (**See Dr. Shah note dated 7/19/2019 Exhibit 21**)

Dr. Fishman performed an interlaminar epidural steroid injection at L4-L5 on July 22, 2019. On August 19, 2019 Ms. Cochran reported to Dr. Fishman that she had experienced a 90% relief of low back and leg pain from the prior lumbar epidural steroid injection. Dr. Fishman advised to continue physical therapy and prescribed Tapentadol. **(See Fishman note Exhibit 22)**

In November, 2019, Ms. Cochran had a brain aneurysm which put the neck surgery plans on hold. She returned to the Center for Interventional Pain and Spine where she was advised to continue with Percocet, a home exercise program and massage therapy.

Dr. Shah evaluated Ms. Cochran on February 21, 2020. He noted the aneurysm issue which he stated caused an eye headache but that there were other symptoms such as fatigue and exertional symptoms consistent with the concussion. **(See Shah note Exhibit 21)**

On June 19, 2020, Dr. Nidhi Agarwal at the Center for Interventional Pain and Spine recommended an L4-L5 lumbar epidural steroid injection. From August 25, 2020 through July 20, 2021, Ms. Cochran underwent acupuncture therapy at Grace Acupuncture and Intergrative Health for chronic neck pain, chronic low back pain with lateral left leg radiating and anxiety.

Ms. Cochran was recommended to have an updated MRI of the lumbar spine at the Center for Interventional Pain and Spine on February 2, 2021.

On April 28, 2021, Ms. Cochran was complaining of increased neck pain to Dr. Jessica Azad at the Center for Interventional Pain and Spine. She was also continuing to complain of lower back pain. Karen Viggiano, CRNP at Center for Interventional Pain and Spine noted on June 21, 2021 that Ms. Cochran was using a TENS unit with benefit. She was advised to continue Percocet and Chlorzoxazone. **(See note Exhibit 22)**

On July 12, 2021, Ms. Cochran was evaluated by her primary care office by Lauren Kershes, CRNP for a wrist injury which she described as occurring because her left leg gave out on her due to her chronic left leg weakness. Ms. Cochran

complained on August 16, 2021 at Center for Interventional Pain and Spine that her left leg was giving out on her at times.

Dr. Shah re-evaluated Ms. Cochran on January 31, 2022 for her neck and back pain with radiation. He diagnosed her as having post-traumatic neck and back pain with radiculopathy and noted that her lumbar radiculopathy down her left leg was worsening. His review of the MRIs of the cervical and lumbar spines showed that the L4-L5 level had compression most prominently. He stated that the next step for her lumbar spine was a left L4-L5 decompression versus a more aggressive L4-L5 decompression and fusion. He did not see any surgical findings on the cervical MRI but noted that area remained aggravated and unhealed. **(See Shah note 1/31/22 Exhibit 21** )

On May 6, 2022, Ms. Cochran returned to LVPG Family Medicine and reported back pain resulting in the need for surgical intervention and she was approved for surgery.

Ms. Cochran underwent a left L4-L5 foraminotomy, laminotomy, and discectomy by Dr. Shah at Penn Medicine on May 12, 2022. Dr. Shah noted that there was direct visual confirmation regarding the neural compression. **(See operative note Exhibit 27** )

On July 22, 2022, Ms. Cochran returned to Dr. Shah for her back pain with radiation. Improvement overall was noted with the back pain and intermittent radiation but there was no resolution. Dr. Shah advised her to continue with physical therapy. **(See Dr. Shah note 7/22/22 Exhibit 21** )

Ms. Cochran last saw Dr. Shah on November 18, 2022 for her continued head, neck, and back pain with radiation. Dr. Shah noted that the back surgery had helped but that she continued with radicular symptoms. Regarding the head injury, she was having short term memory dysfunction. **(See Dr. Shah note dated 11/18/22 Exhibit 21)**

Dr. Shah authored a narrative report dated December 19, 2022. Dr. Shah found that based upon a review of the medical records and reports and diagnostic studies as well as his own treatment of Ms. Cochran that she sustained the

8

following injuries from the May 6, 2018 incident: L4-L5 aggravation injury with worsened low back pain and radiculopathy; accelerated anatomical changes L4-L5; reasonable and necessary lumbar surgical intervention; permanent internal and external lumbar scarring; medically certain need for future L4-L5 decompression and fusion surgery; C4-C7 aggravation injury with cervicalgia and radiculopathy; accelerated anatomical changes at C4-C7; concussion with persistent post concussive syndrome; traumatic brain injury. He found that she sustained permanent brain and spine injuries causally related to the incident. While some of the brain injury symptoms have improved, they have not fully resolved. He found that unfortunately the spinal injuries are surgical in nature. Dr. Shah stated that while she had a remote history of low back pain from approximately 20 years prior, it was the May 6, 2018 incident that was a substantial contributing factor to her spinal conditions. The MRI examination showed neural compression at L4-L5 and C4-C7 and that these areas were at least aggravated as points of weakness susceptible to the 2018 injury mechanism. Dr. Shah noted that there was no historical evidence or documented evidence of spinal complaints or conditions for decades leading up to the most recent injury. There was evidence of accelerated anatomical changes to L4-L5 and to C4-C7 on personal review of the updated MRI studies causally related to the 2018 incident. He explained that when disk levels get injury and/or aggravated from trauma, they undergo accelerated worsening and often become desiccated/collapsed/spondylytic within a matter of months to several years rather than over decades. He found that since it was only approximately 1-3 years since the original post-injury MRIs which is a relatively short time frame, it is within a reasonable degree of medical certainty and probability that the subsequent cervical and lumbar imaging findings represent sequelae of the original 2018 injury. Dr. Shah stated that during the operation there was confirmation of the clinically correlating neural compression. He indicated that she will require further lumbar surgery in the future because she has residual symptoms which will accelerate over time. He also found that she will require a future C4-C7 anterior cervical discectomy and fusion given the probability and certainty of accelerated change. Given the rate of change noted on the subsequent MRIs, this procedure will occur in the next 7 years.

Regarding the traumatic brain injury and post-concussive syndrome, Dr. Shah explained that initial dizziness, headaches and fogginess are classic signs for concussion/TBI. He stated that he reviewed the MRI of the brain and a CAT scan

angiogram of the brain which showed evidence of an incidental right middle cerebral artery aneurysm, but that this is not symptomatic as there is no evidence of any surrounding edema or hemorrhage. He found that her residual post-concussive symptoms are related to the 2018 incident and that while there has been improvement, there has not been resolution of her brain condition.

Dr. Shah found that given her gravity of symptoms to the brain and spine, she remains out of work. She may be able to perform sedentary duties such as lifting less than 10 lbs along with no crouching, stooping, bending, reaching, climbing of stairs. No work at heights and limited driving no greater than 30 minutes per work day. He also stated that she is limited to 2-3 hours sitting per day and will need breaks for stretching every hour. An addendum report dated December 28, 2022, Dr. Shah added that she would have limitations in standing and walking to 2 hours per day due to her extensive injuries.

Regarding future care, Dr. Shah found that she would benefit from future neurocognitive therapy and neuropsychological testing and that she should be seen by neurology for headache management and pain management. He also found that she will require ongoing interventional pain management for her cervical and lumbar spines in the form of injections and that she will require C4-C7 decompression fusion within the next 7 years at a cost exceeding $85,000. Dr. Shah also stated that within the next 10 years Ms. Cochran will require posterior L4-L5 decompression and fusion surgery also at a cost exceeding $85,000. **(See narrative report Exhibit 33 and addendum report by Dr. Shah Exhibit 34 )**

## **LIENS**

There is a workers compensation lien asserted by Hartford in the amount of $319,368.68  (**See WC Lien documentation Exhibit 28)**

## **LOST EARNINGS AND EARNING CAPACITY**

Vocational expert John Dieckman reviewed this matter regarding Plaintiff's lost earnings and lost earning capacity. Mr. Dieckman reviewed the medical records and reports and interviewed Ms. Cochran and reviewed her W-2 2017-2020. Regarding work history, Mr. Dieckman found that prior to the injury, Ms. Cochran had options of a potential job offer from Revlon with an increase in salary and alternate employment possibilities including working as a substitute teacher or child care director or even an inspector for child care facility. Based on the limitations by Dr. Shah identified above, Mr. Dieckman found that she is not able to perform the entire range of sedentary employment. He also found that none of her vocational experience as merchandiser, preschool teacher or school director are consistent with the limitations. He found that in selective situations she may be able to work in positions such as a desk clerk, teller, receptionist, security guard, rental clerk or customer service representative but that she cannot perform all the duties usually associated with work such as a receptionist or customer service representative. She is at best capable of part-time sedentary work. Mr. Dieckman found that based upon her average weekly wage for workers compensation, she had wages of $527.39 per week. He found that she has been out of work for 4 years and 34 weeks since the incident which equates to past lost earnings of $127,522. Mr. Dieckman found that with regard to future lost earning capacity she had an earning capacity of $70,070 and that she has the possibility of earning an average of $34,798. She has the possibility of working in positions with an average salary of $34,798. She is limited to part-time which is equivalent to $17,399. This sum compared to her prior earning capacity of 70,070 equates to a loss of $52,671 annually. He determined that this figure multiplied by the remaining 14.15 of expected work life she will experience a future loss of earning capacity of $745,295. Therefore, combining past lost earnings and future lost earning capacity Ms. Cochran will experience a loss of $872,817. **(See Mr. Dieckman's vocational report Exhibit 36**)

## **WITNESSES TO BE CALLED AT TRIAL**

1. Plaintiff, Dianne Cochran

2. Colby Cochran, son

3. Defendant manager Erica Harrell

4. Jenn Adamski, co-employee of Plaintiff

5. John Yannaconne, Liabilty Expert

6. Nirva K. Shah, M.D. Neurosurgeon Expert medical witness
   Princeton Brain and Spine

7. Kenneth Kutner, Ph.D. Expert Neuropsychologist

8. John W. Dieckman, -Expert vocational witness
   318 East King St.
   Malvern, PA 19355

Plaintiff reserves the right to call any additional witnesses identified during the course of this litigation.

## **EXHIBIT LIST**

1. Matchmg Incident report (Exhibit 2 Cochran Dep)

2. Ulta Salon Report (Exhibit 9 Harrell Dep)

3. Photograph of Essie Stand (Exhibit 1 Cochran Dep)

4. Photograph of Endcap (Exhibit 3 Cochran Dep) cardboard box

5. Photograph of Endcap (Exhibit 4 Cochran Dep) crack

6. Photograph of Endcap (Exhibit 5 Cochran Dep)

7. Photograph of Endcap (Exhibit 6 Cochran Dep)

8. Photograph of Endcap (Exhibit 7 Cochran Dep)

9. Photograph of Endcap (Exhibit 8 Cochran Dep)

10. Notice of Temp Compensation (Exhibit 9 Cochran Dep)

11. Affidavit of Dianne Cochran with Merchandise Instructions

12. Affidavit of Jenn Adamski

13. Grandview Hospital medical records and reports.

14. Lehigh Valley Practice Group Family Medicine medical records and reports.

15. Lehigh Valley Concussion and Head Trauma medical records and reports.

16. St. Luke's Orthopaedic Specialists medical records and reports.

17. MRI Lehigh Valley Imaging medical records and reports

18. OAA Orthopaedic Specialists medical records and reports

19. Lehigh Valley Hospital PT records and reports.

20. Good Shepherd Rehab/Spine Joint Center medical records and reports

21. Princeton Brain and Spine medical records and reports

22. Center for Interventional Pain and Spine medical records and reports

23. Physical Therapy at St. Luke's Quakertown medical records and reports

24. Donna Larkin, LMT Therapeutic massage medical records and reports

25. LVPG Neurosurgery medical records and reports

26. Grace Acupuncture and Integrative Health medical records and reports

27. Operative Note 5/12/22

28. Workers Compensation lien documentation.

29. Medical bills.

30. CV of John Yannaconne

31. Expert report of John Yannaconne, Liability

32. CV of Nirav K. Shah, M.D.

33. Expert report of Nirav K. Shah, M.D.

34. Addendum expert report of Nirav K. Shah, M.D.

35. CV of John Dieckman

36. Expert report of John Dieckman

37. CV of Dr. Kenneth Kutner

38. Expert report of Dr. Kenneth Kutner

39. Wage loss documents

40. Plaintiff's answers to discovery

41. Defendants answers to discovery

42. Plaintiff's school/academic records.

43. Deposition transcript of Dianne Cochran

44. Deposition transcript of Erica Harrell

45. Plaintiff's Complaint and service email to defense counsel

46. Insurance documents and declarations

46. Medical x-rays and imaging

47. Merchandise Instructions

48. Records obtained by subpoena.

Plaintiff reserves the right to introduce as an exhibit any documents exchanged during discovery and this litigation.

## ESTIMATE LENGTH OF TRIAL

3-4 days.

## SETTLEMENT NEGOTIATIONS

Plaintiff demands the sum of $500,000.00 to settle this action. Defendant has not yet made an offer.

**Falcon Law Firm, LLC**

**By:   /s/ Todd M. Sailer, Esq.**
**Todd M. Sailer, Esquire**
**Attorney I.D. #86013**
**Attorney for Plaintiff**